The STATE of Ohio, Appellee,

v.

SMOOT, Appellant.

[Cite as *State v. Smoot* (1991), 75 Ohio App.3d 702.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–753.

Decided Aug. 22, 1991.

*Ronald J. O'Brien,* City Attorney, *Marcee C. McCreary,* City Prosecutor, and *Thomas K. Lindsey,* for appellee.

*Charles A. Schneider,* for appellant.

STRAUSBAUGH, Judge.

This is an appeal by defendant from a judgment of the Franklin County Municipal Court finding defendant guilty of operating a motor vehicle in violation of R.C. 4511.19(A)(3). The trial court suspended execution of sentence pending the present appeal.

The facts in the present case are not in dispute. On March 16, 1990, at 12:11 a.m., defendant, Lewis R. Smoot, Jr., was operating a motor vehicle southbound on State Route 315 at State Route 161. A Sharon Township patrolman stopped defendant for violation of posted speed limits. Following an interview with defendant and the administration of a series of field sobriety tests, the officer placed defendant under arrest for speeding and operating a motor vehicle while under the influence of alcohol. Defendant was then taken to the Worthington police station and through the use of a Breath Alcohol Content ("BAC") Verifier test, defendant was chemically tested in order to determine the level of his blood alcohol. As a result of the BAC test, defendant was also cited for a *per se* violation of operating a motor vehicle with a concentration of .10 of one gram or more by weight of alcohol per two hundred ten liters of breath.

On June 8, 1990, defendant filed a motion *in limine* seeking to restrict the admittance into evidence of defendant's BAC test results. The parties stipulated that on July 15, 1988, a proper radio frequency interference ("RFI") survey had been completed on the BAC Verifier which had tested defendant. The parties also stipulated that the subject BAC Verifier was removed from the Worthington police station and taken to the Ohio State Patrol radio shop for service. Prior to its removal, the location of the BAC Verifier was marked with tape. Following repairs, the BAC Verifier was returned to service on May 12, 1989, after it was determined that the machine had experienced power surges due to a fuse problem. The BAC Verifier was then replaced on the table and on the tape markings so that it was in the same location as it was prior to its removal. Although a new calibration was performed, no new RFI

survey was completed. The parties also stipulated into evidence the transcript of proceedings in *Hilliard v. Crawford* (Aug. 29, 1989), Franklin Cty. M.C. Nos. 89–132720–1 and 89–132720–2, which contained the expert testimony of Harry Thomas Shamansky and Leonard J. Porter. In *Crawford,* the issue was the same as in the present case. The BAC Verifier which was used to test Crawford had been removed, repaired, and returned to the same location with a new calibration being performed but without a new RFI survey being conducted. Following the testimony of Shamansky and Porter, the trial court refused to admit the BAC test results of Crawford.

Following a hearing on defendant's motion *in limine* in the present case, the trial court overruled the motion and defendant changed his plea of not guilty to a plea of no contest to the *per se* violation. The companion charges of speeding and operating a motor vehicle while under the influence of alcohol were dismissed.

Defendant now appeals his conviction and has set forth one assignment of error for this court's review:

"The trial court erred, on a charge of operating a motor vehicle with a concentration of ten hundredths of one gram or more by weight of alcohol per 210 liters of breath, in violation of Ohio Revised Code Section 4511.19(A)(3), 'per se', by admitting into evidence the results of a blood alcohol test not completed consistent with the Ohio Revised Code and the Ohio Department of Health regulations. Specifically, the court erred by ruling that a new radio frequency interference survey (RFI), need not be performed when a machine is moved so long as it 'is placed back in as nearly precisely the same position as it was prior to removal.' "

At the outset we note that defendant sought to exclude his BAC test results through the use of a motion *in limine,* presumably based upon this court's reasoning in a line of cases following *State v. Pedigo* (June 27, 1989), Franklin App. Nos. 89AP–120 and 89AP–121, unreported, 1989 WL 71619. However, recently in *Defiance v. Kretz* (1991), 60 Ohio St.3d 1, 573 N.E.2d 32, the Supreme Court of Ohio held in its syllabus:

"A motion to suppress is a proper pretrial procedure for challenging breathalyzer test results when the defendant is charged with a violation of R.C. 4511.19(A)(3). A plea of no contest does not waive a defendant's appeal from an adverse ruling on the motion."

Given the fact that a violation of R.C. 4511.19(A)(3) is *per se,* the Supreme Court reasoned that a motion to suppress is the proper pretrial method for challenging the admissibility of breathalyzer test results since admissibility turns upon whether there has been substantial compliance with the requirements promulgated by the Ohio Department of Health ("ODH"). For pur-

poses of the present appeal, we will treat defendant's motion *in limine* as a motion to suppress. As noted by the court in *Kretz*, defendant's no contest plea does not affect his rights to proceed with appeal.

Defendant insists that the trial court erroneously permitted the introduction of the results of his BAC test on the basis that a new RFI survey was not conducted following the removal, repair, and subsequent return of the subject BAC Verifier. Defendant argues that the failure to perform a new RFI survey renders the test results suspect and therefore inadmissible.

While strict compliance with the regulations promulgated by ODH may be desirable, the Supreme Court of Ohio has recognized that strict compliance is not always realistically or humanly possible. *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902; cf. *State v. Steele* (1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740. In *Plummer, supra,* the court found that there had been substantial compliance with ODH regulations requiring the refrigeration of urine specimens while not in transit or under examination. Specifically, the Supreme Court held:

" * * * [T]here is leeway for substantial, though not literal, compliance with such regulations. * * *" *Id.* 22 Ohio St.3d at 294, 22 OBR at 464, 490 N.E.2d at 905.

At the time of defendant's arrest, Ohio Adm.Code 3701–53–02(C)(2) provided in pertinent part:

" * * * A new [RFI] survey shall be conducted when a breath testing instrument's spatial placement or axis is changed from that designated in the most recent survey form. * * *"[1]

Several courts of appeal have addressed the issue of whether a new RFI survey is to be performed when a BAC Verifier is moved. In *Columbus v. Crumbley* (Aug. 29, 1989), Franklin App. Nos. 89AP–171 and 89AP–172, unreported, 1989 WL 99440, this court held that a RFI survey which had been

---

**1.** Following defendant's arrest, effective May 5, 1990, the Director of ODH amended Ohio Adm.Code 3701–53–02(C) so as to provide in part:

"(2) A new RFI survey shall be conducted when:

"(a) The location of the breath testing instrument, when used for testing, is moved more than one foot in any direction;

"(b) The instrument's axis is changed;

"(c) The frequency band of the radio transmitting equipment, as defined by the chart set forth in this paragraph, is changed;

" * * *

"(d) The radio transmitting equipment's rated output power is changed;

"(e) Any electronic component of the instrument is changed, other than replacement of parts with original equipment replacement parts or factory-authorized replacement parts meeting the same specifications as the original equipment parts; or

"(f) A new breath testing instrument is placed into service."

performed failed to substantially comply with ODH requirements. In *Crumbley*, this court set forth several reasons why the RFI survey which had been conducted failed to substantially comply: only one hand-held radio was used; the radio used was a one and one-half watt as opposed to a five-watt radio used by the Columbus Police Department and the Franklin County Sheriff's Department; the trooper failed to begin thirty feet from the machine where it was possible to do so; and the machine was removed for repairs and not retested after its return. See, also, *State v. Dorn* (Dec. 12, 1989), Franklin App. Nos. 89AP–421 and 89AP–422, unreported, 1989 WL 149673.

In *State v. Brenner* (July 30, 1990), Butler App. No. CA89–09–127, unreported, 1990 WL 107319, the Twelfth District Court of Appeals rejected the defendant's argument that her BAC Verifier test results be excluded at trial on the basis that no new RFI survey was conducted after the BAC Verifier was removed for repairs. Specifically, the court held:

" * * * [T]he plain language of Ohio Adm.Code 3701–53–02(C) does not require a new RFI survey after a machine has been removed for maintenance. According to the regulation, a new survey is necessary only 'when a breath testing instrument's spatial placement or axis is changed from that designated in the most recent survey form.' * * *" *Id.* at 7.

In *State v. Nolan* (Dec. 12, 1990), Lorain App. No. 89CA004732, unreported, 1990 WL 203496, the Ninth District Court of Appeals held that the removal of a BAC Verifier in order to replace internal parts required that a new RFI survey be conducted. The court found to be particularly troubling the technician's admissions that the machine had been placed back in the "same spot, plus or minus a foot" and that the axis changes when the machine is moved. *Id.* at 5–6. See, also, *State v. Fadenholz* (Jan. 16, 1991), Lorain App. No. 90CA004767, unreported 1991 WL 6141. However, more recently in *State v. Prine* (Mar. 6, 1991), Summit App. No. 14780, unreported, 1991 WL 35156, the Ninth District Court of Appeals rejected the defendant's arguments that a new RFI survey needed to be conducted on a BAC Verifier that had been removed for repairs and was subsequently returned to its prior location. Favorably citing *Brenner, supra,* the court held that the " * * * simple removal of a testing instrument from the site indicated in the most recent RFI survey for maintenance does not automatically result in a change of its spatial placement or axis." *Prine, supra,* at 2. The court included a footnote advising the reader that the court's holding in *Prine, supra,* had been approved by a majority of the members of the court. See, also, *State v. Muehlheim* (Mar. 6, 1991), Medina App. No. 1911, unreported 1991 WL 35152.

In *State v. Petryshack* (May 17, 1991), Portage App. No. 90–P–2209, unreported, 1991 WL 84228, the Eleventh District Court of Appeals addressed

the defendant's arguments that the removal of the subject BAC Verifier for maintenance and repairs on at least five separate occasions required that a new RFI survey be conducted. The court distinguished *Crumbley, supra,* on the basis that not one factor alone had been found to preclude a finding of substantial compliance. Rather, the court reasoned that it was the culmination of a series of acts in *Crumbley* which failed to substantially comply with ODH regulations. Relying upon *Brenner, supra,* the court held that the trial court did not err in finding that the RFI survey substantially complied with ODH regulations since the parties had stipulated that the BAC Verifier was returned to precisely the same position it had occupied prior to being moved and that there was nothing in evidence to suggest that the spatial placement, which refers to the area of the building in which the BAC Verifier is placed, or the axis, which pertains to the position of the BAC Verifier, had changed. The court recognized that had it been presented with different facts or expert testimony as to the effect of the removal of the BAC Verifier, it might have followed the decision in *Nolan, supra,* and required that a new RFI survey be conducted.

In the present case, the stipulated transcript of *Hilliard v. Crawford, supra,* included defense expert Shamansky who testified as follows:

"Q. And is it possible—When you move a machine and bring it back, such as this machine, is it possible to bring it back to a situation where it will be operated exactly as it was before?

"A. Yes, it is possible.

"Q. Okay. I mean, is it possible by the folks that are untrained or that are not engineering specialists?

"A. Well, when we talk about possibilities, we have to look at two sides of the coin, in my viewpoint. There is a small but real statistical possibility that, for example, if an environment—and this is an artificial example—if an environment was completely free of radio frequency interference at all times, then placement of the machine would be immaterial.

"But in actual practice, environments such as this courtroom have a continuous amount of radio frequency interference. So moving the machine, while it does allow a possibility of having similar results, there is also an even greater probability that the results would not be the same.

"Q. It's possible, but it's more probable than not—

" * * *

"Q. It's more probable than not that the accuracy of the machine would not be valid?

"A. It's more probable than not that the machine would be subject to RFI differently to be very accurate, very precise."

Shamansky continued, stating:

"THE WITNESS: If I can refer to a simple analytic simulation that was performed to test this effect, that being movement of the machine and its impact on susceptibility to radio frequency interference, I performed a simulation in which I demonstrated very simply that any movement will alter the effects of radio frequency interference. Based on that scientific principle, I believe that movement of the machine generates doubt and uncertainty, and, therefore, I would infer that the situation, as described, was not compliant.

"Q. Okay. How about the effect of the accuracy of the machine since it was moved? What's your opinion as to whether or not the probability of having an accurate test would result? You understand what I am saying?

"A. I do. Because the machine is a digital instrument, it is very susceptible to interference from electromagnetic sources. And because it is a digital instrument, it is impossible to decide what the outcome of interference will be.

"It can corrupt the reading anywhere from an imperceptible amount to an unbelievable amount, much like the story of the taxpayer who gets charged a billion dollars on tax instead of a thousand dollars on tax. A digital machine has a small error and shifts information.

"So if, in fact, this machine that we're talking about was not properly protected against radio frequency interference, then there can't be anything but doubt as to the machine's ability to render an accurate reading.

" * * *

"Q. Why should the machine be retested after it's moved and repaired and moved for a considerable distance? Why should that happen?

"A. Two very simple reasons which find their foundation in very basic electromagnetics. I want to answer it in two parts. Please remind me if I forget to answer the second part.

"The first part is, by moving the machine even a slight amount—And now we're talking about not just—not only a lateral movement, side to side or front to rear, but also a twist or turning of its orientation. That's the meaning by spatial placement.

"For example, when you do that, you have changed the behavior and the reaction of the machine to its environment. That's first and foremost. That's a very simple sound engineering practice and principle. We do the same thing in our testing.

"Second off, and even more surprising, if you will, is that when a machine is disassembled, taken apart, adjusted, repaired, handled in that nature, the machine will likely demonstrate completely different behavior to radio frequency.

"That is why, for example, all—That is one of the reasons why all electronic equipment that has been read into classified programs to the Department of Defense have security seals that are placed all over the machines such that if it is opened, the machine is no longer useable.

"That is a most significant concern, that if a machine's case is adjusted, moved, or changed in any way, that its behavior will be quite different. And we do the same thing in basic engineering."

The prosecution's witness, Porter, testified on cross-examination:

"Q. When you repair the machine, as it was done in this case, an extensive repair—I think we have got a copy of it here—wouldn't you agree with me you would alter the spatial relationship of a component of the machine? Yes or no.

"A. No. If you alter the spatial placement of the components, then you are placing them at a different point on the board on which the board was designed for its placement.

"Q. How about moving the machine itself?

"A. We have already said that the instrument can be moved. If it were placed in a different location, then it would require a new RFI Survey. If it is brought back to its original placement, then a new RFI Survey is not required.

"We have seen a number of RFI Surveys on instruments that have undergone similar circumstances of repair and replacement with no effect. " * * *

"Q. Would you agree with me that every time you open up the machine, you're changing the susceptibility of RFI interference?

"A. During the time when the instrument is open—in other words, you have left it in its original location; you have unscrewed the four bolts that have held the case to the chassis; you lift off the case—you haven't moved the instrument, but you have disassembled it, in so doing, you have disrupted the shielding that is part of its RFI protection. During that time that the shield is off, the RFI situation is changed. The instrument also will not work to conduct a subject test during a situation.

"Q. Well, okay. Using your example, when you put the cover back on the machine, you just can't guarantee it's in exactly the same place; isn't that right?

"A. Well, it's certainly going to fit in the same four lug nuts; the case on the machine. I think it could be a real trick, especially with my state of mechanical capacity, to unbolt four screws without moving that instrument.

"However, could I place it back where it was had I marked where it was? Yes, I could. If it varied by more than a few thousandths of an inch, would it matter? No, it would not.

"Q. You don't think it matters?

"A. It has not been demonstrated to be of any matter in the tests we have conducted.

"Q. Well, you're talking about the test you have conducted. You have just done surveys, haven't you?

"A. No. We actually tested instruments. In the tests that were conducted by the National Bureau of Standards for the U.S. Department of Transportation, such changes did not have impact. The thing that has impact is the relocation of the instrument in its geographical placement or spatial axis."

Given the parties' stipulation that the machine was replaced in its prior location, which would not alter its spatial placement or axis, as well as the conflicting testimony regarding the influence that RFI will have upon a BAC Verifier, we are unable to conclude that the trial court erred in allowing defendant's BAC Verifier test results to be admitted as evidence. *Brenner, supra; Prine, supra; Petryshack, supra.*

Accordingly, defendant's assignment of error is not well taken and is overruled. The judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

JOHN C. YOUNG, J., concurs.

HOFSTETTER, J., concurs separately.

EDWIN T. HOFSTETTER, J., retired, of the Eleventh Appellate District, sitting by assignment.

EDWIN T. HOFSTETTER, Judge, concurring separately.

Heretofore, prior to *Defiance v. Kretz* (1991), 60 Ohio St.3d 1, 573 N.E.2d 32, my reasoning concerning the propriety of an appeal from a conviction after a motion to suppress is overruled and a "no contest" plea entered comported substantially with the thinking expressed in the dissent in *Kretz, supra.* Thus, in the instant case, I would have found this court to be without justification to address the merits of the assignment because the evidentiary

issue assigned as error was, in fact, waived by the "no contest" plea, and thus I would have affirmed because of that waiver.

Now, as to the merits of the assignment on appeal, I have a problem with the complete rationale of the majority opinion. However, I, too, am unable to conclude, based on the evidence before the trial court, that it erred in allowing the defendant's BAC Verifier test results to be admitted as evidence, and therefore I join the majority in its affirmance.