**CITY OF GREENVILLE, Appellee,**

v.

**HOLZAPFEL, Appellant.**

[Cite as *Greenville v. Holzapfel* (1993), 85 Ohio App.3d 383.]

Court of Appeals of Ohio,
Darke County.

No. 1289.

Decided March 25, 1993.

384

*Jonathan P. Hein,* Assistant Prosecuting Attorney, for appellee.

*Scott D. Rudnick,* for appellant.

WOLFF, Judge.

Ronald S. Holzapfel was charged on August 12, 1990, with a violation of R.C. 4511.19(A)(3), which defines one of the *per se* offenses of driving with certain concentrations of alcohol in bodily substances. After moving unsuccessfully to suppress the evidence of his intoxilyzer test, Holzapfel entered a plea of no contest to the charge, was found guilty, and was sentenced accordingly.

On appeal, Holzapfel alleges that the trial court erred in overruling his motion to suppress/motion *in limine* and advances three assignments of error. Due to their substantial similarity, and in the interests of judicial economy, these assignments of error will be considered together. (The appellee has not favored us with an appellate brief.)

### Combined Assignments of Error I, II and III

"The trial court erred in dismissing defendant's motion to suppress/motion IN LIMINE because the state failed to establish the reliability of the intoxilyzer machine at the time that Holzapfel was tested."

As we stated in *State v. Adams* (1992), 73 Ohio App.3d 735, 598 N.E.2d 176, the reliability of results obtained from breath testing instruments designed and used to determine blood-alcohol levels are dependent upon three "variables": (1) the qualifications of the operator, (2) the condition of the machine, and (3) the test protocol followed. If the state seeks to admit evidence of test results in an OMVI prosecution, it must produce evidence which demonstrates minimum levels of reliability for each of these variables. *Id.*, 73 Ohio App.3d at 741, 598 N.E.2d at 180, citing *Cincinnati v. Sand* (1975), 43 Ohio St.2d 79, 72 O.O.2d 44, 330 N.E.2d 908.

In these assignments of error, Holzapfel does not assert, and the evidence does not support, that the state failed to establish the first of these variables, *i.e.*, the qualifications of the operator, and thus we need only consider whether the trial court properly determined that the state had established the remaining two variables.

### A. Condition of the Machine

In support of his contention that the trial court erred in determining that minimal levels of reliability had been established for the second variable, *i.e.*, the condition of the intoxilyzer, Holzapfel argues that the evidence presented did not establish that the intoxilyzer was sufficiently isolated from radio frequency interference ("RFI") at the time of his test. Specifically, Holzapfel contends that the RFI survey conducted on February 25, 1987, the only such survey conducted prior to his test, did not establish the reliability of the intoxilyzer because (1) the

survey was not conducted in compliance with the survey regulations in effect at the time, and (2) the removal of the machine to Columbus for repairs in June 1990 made it necessary for a new survey to be performed. We will consider each of these arguments in turn.

It is generally acknowledged that radio frequency transmissions, *e.g.*, from AM and FM radios, police station dispatchers, handheld police transmitters, teletypes, and police radar units, can interfere with the accuracy of breath testing equipment. In an effort to ensure the reliability of such equipment, R.C. 4511.19(B) authorizes the Director of the Department of Health to promulgate regulations to reduce the potential of RFI in test locations. In 1987, these regulations, contained in Ohio Adm.Code Chapter 3701–53, established, *inter alia*, that:

"A radio frequency interference (RFI) survey shall be performed for each breath testing instrument listed * * *. Survey results shall be recorded on the form set forth in appendix G to this rule. * * * A new survey shall be conducted when a breath testing instrument's spatial placement or axis is changed from that designated in the most recent survey form." Ohio Adm.Code 3701–53–02(C).

"Breath testing instruments must be checked for calibration no less frequently than once every seven days by a senior operator * * *.

" * * *

"(3) A calibration check shall be made when a new breath testing instrument is set in place or when an instrument is returned to service, before the instrument is used to test subjects." Ohio Adm.Code 3701–53–04(A).

Thus, the 1987 regulation mandated that both calibration checks and RFI surveys be performed on listed breath testing instruments. The purpose of the calibration check is to determine whether the measurement settings for the machine are such that the machine is likely to produce erroneous results. In contrast, the purpose of the RFI survey is to determine whether the environment in which the instrument operates contains radio interference that may affect the operation of the breath testing instrument. See *Adams, supra*, 73 Ohio App.3d at 743, 598 N.E.2d at 181.

In this case, Holzapfel contends that the February 25, 1987 RFI survey conducted on the intoxilyzer used for his test did not comply with these regulations in that it was not performed according to the instructions set forth in Appendix G.

Appendix G of the 1987 regulation established the specific procedures for conducting RFI surveys, and stated, in pertinent part:

"INTOXILYZER: With instrument in zero set mode, transmit while approaching the instrument. If display shows variance greater than .005, mark diagram with an 'X' at the farthest distance from the instrument that variance occurs.

" * * *

"GENERAL INSTRUCTIONS, (continued): * * * Test mobile radio if transmitter antenna can be positioned within 30 foot radius of instrument. * * *

"EXTERNAL DETECTORS: If an external detector is utilized, it is to be tested * * * for sensitivity. If the detector senses RFI, mark diagram with an 'O' at the farthest distance from the detector where the interference is observed. *Sensitivity of detector units is to be adjusted so that the detector will be more sensitive to interference than the instrument.*" (Emphasis added.)

Holzapfel asserts that the RFI survey conducted on February 25, 1987 was not in compliance with these instructions because the officer performing the survey admitted that he neither tested the intoxilyzer variance independently of the external detector nor conducted the survey with a mobile radio.

■ After reviewing the record, we find that Holzapfel is incorrect in his assertion that the failure to test the intoxilyzer with a mobile radio was in violation of Appendix G. Holzapfel fails to mention that the officer conducting the survey testified that the mobile radio was not tested because it was not within a thirty-foot radius of the intoxilyzer. Thus, no mobile radio test was required by Appendix G.

■ However, Holzapfel is correct in his assertion that the failure to test the intoxilyzer independently of the external detector was in violation of Appendix G. Although Appendix G does not expressly state that *both* the intoxilyzer and the external detector must be tested, this procedure is implicitly mandated by the requirement that the external detector be adjusted to a higher level of sensitivity to RFI than the intoxilyzer. It thus follows logically that in order to set the external detector with regard to the intoxilyzer, the officer conducting the test must first test the intoxilyzer to determine its sensitivity. Without testing the intoxilyzer, it would be impossible to set the external detector to the required higher sensitivity level. Thus, in this respect, the RFI survey was not conducted in compliance with the 1987 regulations, and the trial court erred in determining that minimal levels of reliability as to the condition of the machine had been established.

Accordingly, this portion of the combined assignment of error is sustained.

We turn now to Holzapfel's contention that the removal of the intoxilyzer machine to Columbus for repairs made it necessary to conduct a new RFI survey

and that the failure to conduct such a survey rendered the intoxilyzer unreliable at the time of his test.

In this case, the determination of whether a new RFI survey was required after the intoxilyzer machine was taken to Columbus for repairs involves an analysis of both the 1987 and 1990 versions of Ohio Adm.Code 3701-53-02. According to the 1987 version, a new RFI survey was required whenever "a breath testing instrument's spatial placement or axis is changed from that designated in the most recent survey form." According to the 1990 version, all prior RFI surveys conducted according to the 1987 version remain valid until, *inter alia*, the location of the instrument is moved more than a foot in any direction or the instrument's axis is changed. Should either change occur, the 1990 version mandates that a new RFI survey be conducted in accordance with its more exacting methodology.

Holzapfel does not contend that either the location or the axis of the intoxilyzer was different upon its return from Columbus after repairs. He appears to contend, however, that the transportation and repair of the intoxilyzer somehow affected its axis, thus necessitating a new RFI survey.

■ An axis is defined as a "straight line about which a body or geometric figure rotates or may be supposed to rotate." Webster's Ninth New Collegiate Dictionary (1990) 121. In focusing on a change in the instrument's axis and/or location, and not a change in the instrument itself, the regulations require that a new RFI survey be conducted only when there is a change in the location or axis of the instrument. See *State v. Davidson* (Apr. 21, 1992), Union App. No. 14-91-36, 1992 WL 81429, unreported. The removal and repair of the instrument do not, in and of themselves, produce a change in the instrument's axis for RFI purposes as long as the instrument is placed in *exactly* the same location upon its return. See *Davidson, supra; State v. Prine* (Mar. 6, 1991), Summit App. No. 14780, unreported, 1991 WL 35156 (noting that "in resolving any perceived inconsistency between this holding and that of any prior case, the reader is advised that the holding of this case has been approved by a majority of the members of the court"); *State v. Brenner* (July 30, 1990), Butler App. No. CA89-09-127, unreported, 1990 WL 107319; *State v. Smoot* (1991), 75 Ohio App.3d 702, 600 N.E.2d 772; *State v. Burton* (Nov. 29, 1991), Lake App. No. 90-L-15-138, unreported, 1991 WL 252865 (stating that it was inclined to follow the interpretation in *Prine, supra*, but was not required to reach that issue). But, see, *State v. Young* (Apr. 11, 1991), Delaware App. No. 90-CA-40, unreported, 1991 WL 57176 (holding that a failure to conduct a new RFI survey after removing the instrument for repairs does not comply with Ohio Adm.Code 3701-53-02[C] ).

■ Holzapfel does not allege that the intoxilyzer used in his test was not placed in its exact prior location upon its return. Further, several officers testified that the intoxilyzer had been so placed. Therefore, the removal of the intoxilyzer for repairs did not change its axis for RFI purposes, and consequently no new RFI survey was required by either the 1987 or 1990 version of Ohio Adm.Code 3701–53–02.

Accordingly, this portion of the combined assignments of error is overruled.

### B. Test Protocol

We turn now to Holzapfel's contention that the trial court erred in its determination that the third reliability variable, *i.e.*, a proper test protocol, had been established.

Ohio Adm.Code 3701–53–02(C)(1) provides:

"Radio transmitting antennae shall not be used within any RFI–affected zone during conduct of a subject test or a calibration check. No radio transmitting antennae that have not been subjected to an RFI survey shall be used within thirty feet of the breath testing instrument during conduct of a subject test or a calibration check."

In support of his contention that the state failed to establish that his test was conducted properly, Holzapfel argues that the state did not prove that no radios were being used in violation of this protocol during the time of his test. Specifically, Holzapfel contends that the officers conducting his intoxilyzer test violated the test protocol when they failed to traverse the relevant area prior to administering the test to ensure the absence of prohibited radio usage at that time.

■ Nothing in the Administrative Code mandates that officers must physically ensure that prohibited radio usage does not occur during an intoxilyzer test. Indeed, such assurance is the purpose of external detectors and RFI surveys. If prohibited radio use occurred during a test period, the external detector would sense the interference and "shut down" the machine. Therefore, as long as the intoxilyzer and the external detector are established to be in proper operating condition, there is a presumption that the test protocol prohibiting certain radio operation during test periods has not been violated.

■ If the accused believes that prohibited radio usage occurred during his test period, he may rebut this presumption by coming forward with evidence that such prohibited radio usage did occur at the relevant time. *Adams, supra,* 73 Ohio App.3d at 744, 598 N.E.2d at 182. If the accused is able to sufficiently show prohibited radio usage, the introduction of any evidence concerning the breath test result would be precluded. *Id.*

■ Holzapfel presented no evidence of prohibited radio usage during his intoxilyzer test and therefore did not meet what would ordinarily be his burden as to this variable. However, a court cannot find that the test protocol prohibiting certain radio usage during intoxilyzer testing was not violated where, as here, the proper operating condition of the intoxilyzer and the external detector, due to the failure to survey as to the intoxilyzer, was not established. Without evidence that these instruments were in proper working order and that the external detector would have detected RFI and shut down the intoxilyzer, we cannot indulge in the presumption that no prohibited radio usage occurred during the test period. Without the benefit of this presumption, we could only determine that the test protocol had been followed were it evident from the record that there was no prohibited radio usage at the time of the test. The record in this case neither establishes nor negates the possibility of prohibited radio usage during Holzapfel's test. Therefore, the record does not indicate that the test protocol was sufficiently established for minimal reliability, and the trial court erred in finding otherwise.

Accordingly, this portion of the combined assignments of error is sustained.

The judgment of the Darke County County Court, S.W., is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

FAIN, J., concurs separately.

BROGAN, J., concurs.

FAIN, Judge, concurring.

In this case, there apparently is testimony in the record that after its removal for repairs the intoxilyzer was restored not only to the exact same location, but also to exactly the same orientation about its vertical axis of rotation. I would simply note that this testimony is sufficient to distinguish this case from *Fairborn v. Ellis* (Oct. 26, 1992), Greene App. No. 92–CA–19, unreported, 1992 WL 311345, in which we affirmed the suppression of a breath-alcohol test.